In re Estate of HUGH THOMASSON, deceased: TAYLOR R. YOUNG and P. H. CULLEN, Respondents, v. THE BOATMEN'S NATIONAL BANK of St. Louis, Executor of the Estate of HUGH W. THOMASSON, deceased, Appellant.—No. 36823.—171 S. W. (2d) 553.

Court en Banc, April 5, 1943.

Rehearing Denied, May 4, 1943.

1158

*Franklin E. Reagan, James V. Frank* and *Chas. Claflin Allen, Jr.,* for appellant.

1160

*Elliott W. Major, Clem F. Storckman* and *Cullen Coil* for respondents.

1162

ELLISON, C. J.—The defendant bank, as executor of the estate of Hugh W. Thomasson, deceased, appeals from a judgment of the circuit court of the City of St. Louis allowing the plaintiffs-respondents Taylor R. Young and P. H. Cullen (the latter now deceased and represented by his executor) an attorney fee of $42,500 for legal services rendered to. the administratices of the deceased Thomasson's estate while they were in charge thereof before his will was found.

The administratrices had been appointed in February, 1933, about a month after the death of the supposed intestate; and on the same day by written contract they employed the respondents to represent the estate, and themselves as administratrices. But a little over eight months later, in October, 1933, a will executed by Thomasson was found. Upon the discovery of the will the administratrices were supplanted by the appellant bank, the executor named therein; and in February, 1934, they filed in the probate court a final settlement covering their administration up to the revocation of their

letters. The probate court shortly thereafter approved it. This settlement was prepared by their attorneys, Young and Cullen; but it did not include any charge for the legal services theretofore rendered to the estate by said attorneys.

When the will was produced the heirs promptly brought a suit contesting it, on the ground of testamentary incapacity. During the period of the contest the appellant served as administrator pendente lite. This litigation continued for over three years until a judgment sustaining the will was affirmed by this court in April, 1937 [Townsend v. Boatmen's National Bank, 340 Mo. 550, 104 S. W. (2d) 657.] A few days later, the respondent attorneys filed in the probate court a motion for the allowance of their fee as attorneys for the administratrices during the prior intestate administration. The appellant executor contested the motion. The probate court ruled against the respondents, filing a memorandum opinion, but on appeal the circuit court gave judgment in their favor. Then followed the instant appeal by the executor to this court.

Appellant's main contention is that the judgment of the probate court approving said settlement to revocation was final and binding on both the administratrices and the respondent attorneys; and since they failed to have their attorney fee allowed in the settlement, they were forever barred thereafter. Another contention is that any services performed by respondents were not rendered to the estate, but were referable to a different contract (on a 50% contingent fee) which they had previously made with some 35 relatives and prospective heirs of Thomasson, including the administratrices, to protect him and his property from the machinations of certain persons, to the end that said relatives might thereafter obtain their shares of his estate at his death, as his heirs. Again, it is claimed the services principally were for the purpose of protecting the title to Thomasson's *real estate* which passed directly to his heirs or devisees, not to the administratrices as such, in consequence of which such services were not chargeable to the estate. Other assignments complain of the admission and exclusion of evidence.

Appellant's first contention—that the probate court's judgment approving the administratrices' settlement to revocation bars the respondents' claim for attorney fees—is based on Matson & May v. Pearson, 121 Mo. App. 120, 134, 97 S. W. 983, 987. The suit there had been brought by two lawyers directly in the circuit court *in equity,* against the administrator d.b.n., c.t.a. of an estate, for legal services rendered the preceding executor, who had resigned and died without making a settlement to revocation. In endeavoring to find a basis for equitable cognizance of the suit the St. Louis Court of Appeals in a long opinion (by Nortoni, J.) enumerated the three *legal* methods of presenting such claims for attorney fees.

It said the first of these would have been for the retiring executor to have made a settlement claiming credit for the attorney fees, and to have obtained a reasonable allowance therefor; but since he had died without making any settlement the plaintiff attorneys were foreclosed as to that method. Next, it said the attorneys could have presented their claim directly to the probate court and had it allowed as a demand against the estate. Thirdly, they might have brought a suit at law in the circuit court for their attorney fee and exhibited the judgment for allowance in the probate court. But the decision declared the second and third methods would have to be followed in one year (under Sec. 184 V, R. S. 1899), and would have resulted in the classification of the claim as a fifth class demand, in which event the plaintiffs would have been denied the priority to which they were entitled because their claim was really an expense of administration. And so the decision concluded the plaintiff attorneys had properly brought their suit in equity because they had no adequate remedy at law.

Appellant interprets the foregoing statements in the Matson case as meaning that any claim for legal services rendered to a prior executor must be presented to the probate court by that executor, or asserted by the claimants while he is in office. Appellant's brief says the decision held our probate courts *do not have power* to make a fee allowance to an attorney employed by a prior executor or administrator, after the latter had died without asking such allowance; and that the St. Louis Court of Appeals for that reason permitted the plaintiffs there to sue in equity.

We do not so construe the Matson decision. As recited in the opinion (121 Mo. App. l. c. 123-4, 97 S. W. l. c. 984) the letters testamentary in that case were issued to the first executor on October 26, 1903, and he died before May 25, 1904, which was just about seven months after the letters were granted. Yet the opinion conceded (121 Mo. App. l. c. 134-5, 97 S. W. l. c. 987-8) the plaintiff attorneys could have established their claim if they had presented it as a demand directly in the probate court or had sued thereon at law in the circuit court, ''within one year from the grant of the first letters on the estate.'' That year included five months *after the preceding executor had died.* So it is clear the Matson opinion did not hold the plaintiffs there had *lost the right* to assert their claim at law because they failed to do so before the death of the preceding executor.

Further conclusive on that point is the fact that the opinion expressly sanctioned equity jurisdiction on the ground that if the plaintiff attorneys *had* asserted their claim by probate demand or action at law in the circuit court it would have *lost the priority* to which it was entitled—that is, it would have been classified as a fifth class demand when it properly was an *expense of administration.* In short, the ruling was that the plaintiffs there had no adequate remedy

at law and were entitled to sue in equity *solely* because at law the proper *classification* of their claim would have been prejudiced. It was so construed by a later decision of the same court. State ex rel. Tempel v. Garesche, 198 Mo. App. 457, 461, 200 S. W. 735, 736(1). And if the claim was admissible to classification at all, it was not filed too late.

This ruling in the Matson case was partly right and partly wrong, in our opinion. The holding that a claim for attorney fee for services rendered an estate is an expense of administration, is correct, with qualifications. As more fully explained in Nichols v. Reyburn, 55 Mo. App. 1, 5, the attorney contracts on the credit of *both* the administrator and the estate. The administrator making the contract is personally bound by its terms; the estate, only insofar as the services are necessary or beneficial and the charges reasonable. (See also Sec. 2450, R. S. 1939, Mo. R. S. A., sec. 2450.) To that extent the attorney's claim is an expense of administration which *must* be allowed by the probate court ahead of the claims of creditors, under Secs. 220, 224, R. S. 1939, Mo. R. S. A., secs. 220, 224.

Also, as correctly held in the Matson and Nichols decisions, the claim may be asserted *directly* in that court by the claimant, under Sec. 185, R. S. 1939, Mo. R. S. A., sec. 185. Initial presentation in the administrator's settlement for allowance as a credit to *him*, is unnecessary. The respondents' contract with the administratrices in this case provided that they were "to represent the estate and the administratrices thereof in all matters" (except as to personal claims of respondents against the estate); and that their fees "shall be reasonable fees as the Court shall find to be just and proper." It therefore came within the rule of the Nichols case, as to reasonableness. This Nichols case has been frequently quoted, cited or followed in principle, and is in accord with the rule in many other jurisdictions.[1]

More emphatically, Crow v. Lutz, 175 Mo. App. 427, 431, 162 S. W. 679, 680, declares an attorneys' claim for such services is not a demand in the strict statutory sense, but an expense of administration as much as the probate judge's fees; and that it need not be verified and formally presented, but may be asserted by written motion even after the expiration of the one year period of limitation

---

[1] 21 Am. Jur., sec. 513, p. 669; sec. 517, p. 671; secs. 545-548, pp. 686-689; 24 C. J., secs. 530-532, pp. 97-99; sec. 542, p. 103; sec. 545, p. 106; sec. 549, p. 109; sec. 931, p. 310; sec. 933, p. 313; sec. 1161, p. 423; 33 C. J. S., sec. 199, pp. 1183-4; sec. 22, pp. 1209-1214; sec. 225 c, d, p. 1219; sec. 227, p. 1225; sec. 228, p. 1228; 34 C. J. S., sec. 386-b, pp. 140-147; sec. 388, p. 150; State ex rel. O'Brien v. Walsh, 67 Mo, App. 348, 352; Grove v. Reynolds, 100 Mo. App. 56, 59, 71 S. W. 1103, 1104; Dooley v. Welch, 172 Mo. App. 528, 534, 158 S. W. 454, 456; Skinner v. Whitlow, 184 Mo. App. 229, 246, 167 S. W. 463, 468; Greenwood v. Zausch, 190 Mo. App. 638, 643, 176 S. W. 271, 272; Mayhall v. Stoecker (Mo. App.), 191 S. W. 1117, 1118; State ex rel. Zeppenfeld v. Calhoun, 219 Mo. App. 482, 486, 279 S. W. 188.

fixed by Secs. 182 and 186, R. S. 1939, Mo. R. S. A., secs. 182, 186, as was done in this case. (In this connection see 21 Am. Jur., sec. 349, p. 580; 34 C. J. S., sec. 398, p. 164.) Other decisions have gone further, holding charges of this character "need no allowance except in connection with the making of the final settlement." Thompson v. Thompson (Mo. App.), 217 S. W. 863, 864(2); Hoffmeyer v. Mintert (Mo. Div. 1), 93 S. W. (2d) 894, 899(6); Bacon v. Dearmont (Estate of Carlin), 226 Mo. App. 622, 627-8, 47 S. W. (2d) 213, 215-6 (12, 13). And in another case where the attorney's claim was formally presented as a demand but showed on its face that it was for necessary legal service rendered an executrix, it was held the claim was not a demand within the meaning of the non-claim or limitation statutes, and was not subject to classification. Hewitt v. Duncan, 226 Mo. App. 254, 259(13), 43 S. W. (2d) 87, 89(13). We agree with this decision and disagree with the holding on the same point in the Matson case, supra [121 Mo. App. l. c. 134-5(3), 97 S. W. l. c. 987-8(3)]. In our opinion the question whether such a claim is a creditor's claim or an expense of administration depends on its nature, not on its form; and if it is the latter, it takes precedence over creditors' claims and need not be classified.

The learned probate judge below said in his written opinion that Sec. 220, supra (then Sec. 221, R. S. 1929) made it mandatory on the probate court to allow the administratrices "in their final settlement, 'all reasonable charges for legal advice and service,' if any such charges had been incurred by them as administrators of this estate." In so stating he assumed the settlement of the administratrices to revocation was a final settlement; and from that he reasoned it was equally mandatory on the administratrices or the respondent attorneys to ask in or at *that* settlement for allowance of the latter's claim. As we have already stated, Sec. 220 does require the probate court to allow all such reasonable charges, and Sec. 224 gives them priority; but the two sections apply to *all* settlements of executors and administrators, whether intermediate or final—in other words to any settlement at which the charges are presented. They do not purport to fix a limitation for the presentation of such claims.

Whether or not a settlement is final so as to bar the subsequent presentation of claims for attorney fees and other expenses of administration, depends on other statutes. Sec. 213, R. S. 1939, Mo. R. S. A., sec. 213, provides generally for the making of all *regular* settlements of executors and administrators; and also for settlements where the incumbent has resigned or been removed from office. It further prescribes what the settlements shall contain. But as regards *final* settlements, still other statutes govern. Secs. 229 and 230, R. S. 1939, Mo. R. S. A., secs. 229, 230, cover regular final settlements of the *estate*. Secs. 48 and 49, R. S. 1939, Mo. R. S. A., secs. 48, 49, deal with final settlements *as between* an outgoing executor or ad-

ministrator and his successor. Under Sec. 229, a notice *to all creditors* must be published in the case of regular final settlements of the whole estate; and Sec. 230 makes the probate court's adjudication thereon *conclusive on all persons* claiming thereunder. But under Secs. 48 and 49, the settlement of the retiring executor or administrator with his successor is made voluntarily, or on motion of the latter on "due" notice to the retiring incumbent alone. There is no notice to creditors.

Consider next what the statutes say such settlements shall contain. Secs. 213, 220, 221, 224 and 225, supra, dealing with regular settlements (and Sec. 213 also with settlements to revocation), contemplate in substance that they shall give a true accounting in detail of receipts and disbursements. One of them, Sec. 221, calls for a showing in the settlement that every claim for which disbursements have been made has been duly *allowed* by the court. Another, Sec. 224, requires the court, when necessary, to ascertain the amount of *allowed* debts which have not been paid. Sec. 225 calls for a continuance of the same procedure at every settlement until *all* debts are paid or the assets exhausted. And Sec. 230, dealing with final settlements, says it must appear as a prerequisite thereto that the estate has been fully administered and *all* debts paid. This obviously refers not only to allowed debts, but also to expenses of administration, which have priority under Sec. 224 and must be paid under Sec. 220. These latter *may* be presented at any settlement; yet since they may accrue clear up to the end of the administration and are not subject to the non-claim statutes, it is only at the final settlement of the estate that they *must* be asserted. The whole statutory structure, in our opinion, supports the view of the Crow and other cases cited in the third preceding paragraph.

Sec. 48 (and Sec. 49), supra, exclusively dealing with settlements to revocation, requires the retiring executor or administrator to "account for, pay and deliver to his successor," all real and personal assets of the estate, together with the papers of the deceased, "at such time and in such manner as the court shall order, on final settlement with" such retiring administrator or executor. This accounting necessarily calls for a disclosure of assets received and paid out, and of the balance or assets on hand. But it does not require the retiring representative to report third party claims which have not been asserted or liquidated and upon which nothing has been paid (as in the instant case), merely because he knows or has heard about them. 21 Am. Jur., secs. 496, 497, p. 659; sec. 343, p. 557. It was held in Jessup v. Smith, 223 N. Y. 203, 207-8, 119 N. E. 403, 404(3), that the assertion of such unsatisfied claims in a settlement to revocation would be premature; and that case and Lamb-Davis Lumber Co. v. Stowell, 96 Wash. 46, 48-9(2), 164 Pac. 593, 594(2), L. R. A.

1917E, 966, 968, also held they can be asserted for allowance later against the succeeding representative.

Such settlements between the retiring incumbent and his successor are final and binding when approved by the court, the successor representing the heirs, beneficiaries and creditors of the estate.[1] And so here if the administratrices had paid respondents' fee for legal services but had failed to ask credit for the disbursement in their settlement to revocation, we will concede they could not thereafter recover back the amount from the estate. But nevertheless such settlements are not final settlements of the *estate*.[2] The administration, as such, is unaffected by the change in representation and goes on as if it had not been made.[3] And while creditors are precluded from disputing the correctness of the settlement, yet they are not deprived of the right to have their claims satisfied out of the estate as shown by the settlement and turned over to the succeeding representative.[4] As already held, respondents' claim was an expense of administration, provable by them *directly* against the estate up to the time of final settlement.

Furthermore, when the administratrices were ousted upon the production of the will and the will was immediately contested, it operated as an appeal from the order admitting the will to probate. The appellant bank was granted letters testamentary one day and appointed administrator pendente lite the next. This had the effect merely of suspending the administratrices until the outcome of the will contest was known. If the contestants had prevailed and the will had been rejected, the administratrices would have been reinstated (Sec. 14, R. S. 1939, Mo. R. S. A., sec. 14) and the intestate administration prosecuted to a conclusion,[5] with the respondents serving as attorneys for the estate. They were therefore justified

[1]State ex rel. Bearden v. Am. Sur. Co., 231 Mo. App. 491, 497, 104 S. W. (2d) 755, 759(2); State ex rel. Mann v. Reynolds (Mo. App.), 62 S. W. (2d) 483, 485(3); State ex rel. Richardson v. Allen (Mo. App.), 224 S. W. 11, 12(1); Emmons v. Gordon, 125 Mo. 636, 644(1), 28 S. W. 863, 865(1); State ex rel. Pountain v. Gray, 106 Mo. 526, 533(1), 17 S. W. 500, 501(1); Michie v. Grainger, 149 Mo. App. 301, 305, 129 S. W. 983.

[2]Estate of Glover & Shepley, 127 Mo. 153, 157(1), 29 S. W. 982, 983; Booker v. Armstrong, 93 Mo. 49, 60, 4 S. W. 727, 730.

[3]21 Am. Jur., secs. 779, 780, p. 816; 24 C. J., sec. 2743, p. 1149; ·sec. 2750, p. 1156; sec. 2777, p. 1166; 34 C. J. S., sec. 1025, p. 1281; sec. 1030, p. 1284; 3 Woerner, Am. Law of Administration (3 Ed.), sec. 536, p. 1839; State ex rel. Richardson v. Allen, supra, 224 S. W. 1. c. 13; State ex rel. Crane v. Heinrichs, 82 Mo. 542, 550; State ex rel. Collins v. Dulle, 45 Mo. 269, 272; State to use Blanton's Admr. v. Hunter, 15 Mo. 490, 491-2.

[4]Griffin v. Priest (Mo. App.), 137 S. W. (2d) 685, 689(6).

[5]State ex rel. Ashton v. Imel, 243 Mo. 180, 186-7, 147 S. W. 989, 991; Leahy v. Mercantile Trust Co., 296 Mo. 561, 591(5), 247 S. W. 396, 403(11); State ex rel. Barlow v. Holtcamp, 322 Mo. 258, 264(1), 14 S. W. (2d) 646, 649; Kinnerk v. Smith, 328 Mo. 513, 521-2, 41 S. W. (2d) 381, 384(1).

further in waiting until the will contest had been decided to file their claim for attorney fees. This assignment is ruled against respondents.

The next assignment is that any legal services performed by respondent were not rendered to the estate, but were referable to the contract they had previously made with some 35 relatives and prospective heirs of Thomasson, who was a senile old bachelor of doubtful mentality. He had become involved with an adventuress, whom he married three times, and upon whom he squandered much of his estate. To her he deeded some of his real estate in St. Louis, and mortgaged other parts. At times the adventuress and her conspirators kept him in hiding in other states. In September, 1931, respondents entered into the aforesaid written contract with the relatives. This was seventeen months before the administratrices were appointed and employed respondents to represent the estate.

The prior contract with the relatives required respondents: to take such steps as might be necessary to protect Thomasson's body, person and property and prevent "certain" designing persons from obtaining it; to institute any proceedings necessary thereto; to take the necessary steps to obtain said contracting relatives' shares in Thomasson's estate as his heirs at law after his death; to perform all service that might be necessary to set aside the will of Thomasson, if there was any; to have a guardian appointed for him if he could be found; "and also to perform any other legal services that may be necessary in the Probate Court, respecting the estate of the said Hugh W. Thomasson for the contingent compensation hereinbefore mentioned." At the trial Mr. Cullen, one of the respondents, testified it was understood any fee received by them as attorneys for the administratrices would be "taken into account in adjusting" their contract contingent fee due from the heirs, and was not to be in addition to the latter.

Appellant contends this contract meant the respondents were to protect and sequester Thomasson's property during his life, and after his death obtain for the contracting relatives their shares of his estate by annulling his will, if any, and taking his estate through probate —that it required a doorstep delivery of the property, so to speak, after the payment of Thomasson's debts. Two cases are cited. In one, In re Peterson's Estate, 58 S. D. 76, 77-8, 79, 234 N. W. 923, 924(3), the attorney's contract stipulated: "In consideration of said contingent fees, that second party (the attorney) shall completely probate the estate of the said . . . deceased, in county court." It was ruled he must render that service under the contract without additional compensation from the estate. In the other case, In re Barreiro's Estate, 125 Cal. App. 752, 771-2, 14 Pac. (2d) 786, 794(9, 10), an executor was denied credit for payments made to an attorney for services rendered to an estate, where the testator before

his death had paid the attorney for that same service and taken his receipt therefor.

In both those decisions the attorney had specifically agreed to perform the very services involved, for compensation to be paid by someone other than the estate. We think they are not in point unless the contract here was of the same character—and we do not so regard it. The last clause of the contract as quoted above, standing alone, is the strongest one in appellants' favor. It required respondents for the contract fee to perform any "other" legal services that might be necessary in the probate court respecting the Thomasson estate. What class of services, and necessary for what? In view of the preceding clauses, it must have meant services necessary to attain the general objective of the contract, which was to recover for the contracting heirs their net shares of the estate after the payment of debts and expenses of administration—in other words, *after* probate. No one could tell at the time the relatives' contract was made when and where there would be a probate administration on Thomasson's estate, who the administrator would be, and whether the respondents would be acceptable to the administrator as estate attorneys. Undoubtedly the services contemplated by the relatives' contract were services to the prospective heirs who joined therein. They could not legally contract that the respondents as attorneys for Thomasson's administrator should represent his heirs solely and personally. Orr v. Sanford, 74 Mo. App. 187, 191.

 With respect to the assets that come into his custody or control by virtue of his office an executor or administrator is trustee for *all* parties interested, the deceased, the beneficiaries, and creditors. State ex rel. Buder v. Brand, 305 Mo. 321, 327, 265 S. W. 989, 990(4). So, likewise, the test as to the services rendered by the attorney for such "trustee," is whether they are beneficial to the *whole* estate rather than some special interest. Skinner v. Whitlow, 184 Mo. App. 229, 246(18), 167 S. W. 463, 468(16). This is true even where the attorney is directly employed by the administrator. Trautz v. Lemp, 334 Mo. 1085, 1094(1, 2), 72 S. W. (2d) 104, 107 (1, 2). On this theory it is said the general rule is, that while no allowance may be made out of an estate for legal services rendered for the sole benefit of particular heirs or beneficiaries, yet such allowance may be made insofar as the attorney employed by such heirs is recognized as attorney for the whole estate and his services are accepted and beneficial thereto.[1]

[1] 79 A. L. R., pp. 522-5, note; 21 Am. Jur., secs. 548, 689; 34 C. J. S., sec. 386 b, p. 143-4; sec. 388, p. 150; Cline v. Stratton, 233 Ky. 568, 26 S. W. (2d) 487, 488(2); Farmers' Bank & Trust Co. v. Stanley, 190 Ky. 762, 228 S. W. 691, 694(8); In re Lounsberry's Estate, 234 N. Y. S. 680, 682(2).

This harmonizes with and is analagous to the doctrine announced in Nichols v. Reyburn, supra, 55 Mo. App. 1. c. 5, and several subsequent decisions, that when an *administrator* employs an attorney to represent the estate, the contract has a double aspect. The administrator is personally bound thereby, but the estate also is bound insofar as the services rendered to it are necessary or beneficial and the charges reasonable. And in Goodman v. Griffith, 155 Mo. App. 574, 581-2, 134 S. W. 1051, 1053-4(4), it was held an administrator's attorney does not forfeit his right to compensation from the estate for services rendered to it, merely because he also represented the administrator in presenting the latter's personal claim against the estate. So on this assignment we conclude the legal services rendered by respondents to the Thomasson estate during the intestate administration were not referable to the relatives' contract, but to the administratrices' contract; and pass to the next assignment which is that none of the services performed by respondents were *in fact* rendered to the estate, but all were rendered to the heirs.

Appellant's principal contention on this assignment is that the services rendered by respondents under the contract with the administratrices mainly were in quieting the title to Thomasson's real estate; and that since the title to a decedent's real estate passes to his heirs or devisees, and not to his administrator or executor, the fee for these services cannot be charged to the estate. This calls for a review of the facts showing the condition of Thomasson's estate both before and after his death, what claims were being asserted against it, and what legal services the respondents rendered. The record is long, containing 709 pages; respondents' briefs 209 pages, and appellant's briefs 143 pages. We cannot extend the opinion by going into all these matters in detail; but shall merely summarize the evidence.

Thomasson's main assets were two pieces of real estate in St. Louis: one at the corner of Broadway and Washington Avenue, covered by leases and occupied by a Woolworth store; the other at Euclid and McPherson Avenues. In addition to that he had five or six unimproved lots in St. Louis County. The gross value of the estate was about $750,000. He had little personalty except rents from these properties, which amounted to about $30,000 per year. But substantially $38,000 in accumulated rents was impounded in litigation at the time the administratrices were in office. Both sides concede his business ▮ affairs became increasingly involved during the two years next preceding his death, through the machinations of the adventuress and her conspirators, and in consequence thereof. As illustrative of this we may say that exclusive of this case sixteen proceedings involving his estate have reached this court before and since his death, of which ten are reported. Thomasson's lack of mental capacity to transact business was the theme in all or most of them.

Appellant's brief admits he had become of unsound mind by July, 1930, when he married "the woman," as the adventuress is called by both parties after the exhaustion of adjectives.

Less than a month later they signed a separation agreement in which he agreed to pay her $1000 per month separate maintenance. In August, 1930, he and the woman executed a deed of trust on the Euclid-McPherson property to secure a note for $25,000 due in three years, and six interest notes for $750 each. Subject thereto, on January 26, 1931, he and the woman conveyed that property and the Broadway-Washington property to John Zesch, a conduit of title, who contemporaneously reconveyed it to the woman alone. About a month later, on February 24, the same thing was done again except that the conduit then reconveyed to Thomasson and the woman as husband and wife. In between these two transactions, on February 2, 1931, the woman executed two warranty deeds conveying both the Broadway-Washington and the Euclid-McPherson properties to Conrad E. Frederick, one of her former associates, who had reformed it seems, and was secretly acting at the instance of respondents in the interest and to the use of Thomasson. We so understand the record. These deeds were not recorded until August 12, 1931, just after Thomasson and the woman on August 1 had executed a deed of trust on the Broadway-Washington property securing the payment of $125,000 in notes and appropriate interest notes, 389 in all. Of these, notes aggregating $44,000 were delivered to one of her former attorneys, Stephen Rogers. Respondents testified the Frederick deeds were recorded to prevent the negotiation of this issue of notes. There was also testimony that another deed of trust on the Broadway-Washington property was executed by Thomasson in February, 1931, but not recorded, securing outstanding notes aggregating $250,000. And there were, furthermore, deeds of trust on some of the lots in St. Louis County, securing notes totaling $15,000 which had been given for fees to other attorneys.

All this was before respondents were employed by the relatives in August or September, 1931. Respondents represented the relatives in various litigations growing out of the foregoing; but we need not go into that, except to say inquisitions into Thomasson's sanity were instituted by respondents in St. Louis and by the woman in St. Louis County. Contests were waged over the jurisdiction of the respective courts and finally decided by this court in favor of respondents' clients, the relatives. There was also litigation over the rents from the Broadway-Washington property which reached into the justice, circuit, appellate and Federal courts. Finally, in January, 1933, the woman took Thomasson to Arkansas, where he was adjudged sane and he and the woman were married a third time. He died on January 28.

After the administratrices were appointed and the respondents were employed as their attorneys on February 13, the Probate Court of St. Louis on March 16 ordered the administratrices to take charge of Thomasson's real estate and rent it to pay debts. Thereafter $102,-859.83 in disputed claims were filed against the estate, and $6477.07 of undisputed claims. Claims amounting to about $200,000 were asserted but not filed before the revocation of the administratrices' letters. There were numerous suits by or against Thomasson pending in various courts which the respondents looked after as attorneys for the administratrices. On March 9 they brought two suits, No.'s 190,001 and 190,002, in the circuit court of St. Louis to quiet the title respectively to the Broadway-Washington and the Euclid-McPherson properties as against the several deeds Thomasson had executed, and also, to cancel the notes and deeds of trust he had executed thereagainst. Another similar suit covering the lots in St. Louis County was filed on September 20. All these notes aggregated over $400,000.

On the latter date respondents concluded a compromise settlement with the woman, which covers twelve pages of the printed record. It listed nineteen pending court proceedings brought by or against Thomasson, or involving his property. These included the two St. Louis quiet title suits, Nos. 190,001 and 190,002; and the similar suit in St. Louis county; and stipulated that judgment should be entered against the contention of the woman in each, in accordance with stipulations to be prepared by counsel for the administratrices. It further required the cancellation of the woman's separate maintenance agreement exacting the payment of $1000 per month, and called for the surrender to the administratrices of the lease on the Broadway-Washington property exempt from any lien on the rents thereunder; and of two deeds of trust thereon, one unrecorded securing $250,000 in notes, and the other recorded and securing the aforesaid $125,000 in notes, together with all of the latter notes under the control of the woman or her former attorney, Wilfred Jones. It also called for a quitclaim deed from a trustee then holding title to the Euclid-McPherson property; and required that the woman should execute to Ella Bolles and Elmira Townsend (who were the administratrices), as trustees for the persons to be named therein, general warranty deeds conveying all real estate and personal property owned by Thomasson on July 30, 1930. As a consideration for these stipulations (and others which we need not recite) the woman and her attorneys were to receive $30,000 as soon as available, and a further sum of $20,000 in seven deferred installments, which latter should go to her attorneys.

The woman duly executed and delivered the warranty deed to Ella Bolles and Elmira Townsend as trustees for specified heirs of Thomasson who had employed respondents, together with the respondents

themselves (they having the one-half contingent fee interest). But the deed further recited that the grantees were administratrices of Thomasson's estate, then in process of administration, and that they should hold the land in full recognition that it was subject to debts of the estate and to probate sale. The settlement was approved by the probate court the day it was made. But the woman had not delivered all the contracts claimed and other instruments called for by the settlement when the will of Thomasson was brought to light and probated about a month later on October 24. It gave practically the whole estate to the public school fund of the State. The probate court also approved the administratrices' settlement to revocation, showing the payment to the woman of $30,000 called for by the compromise settlement. Some of the claims intended to be settled have since been asserted, and the woman has repudiated the settlement.

Reverting now to appellant's contention that in bringing the three "quiet title" suits and effecting the above compromise settlement, the respondents were acting only for Thomasson's heirs, because a decedent's realty passes directly to his heirs and not to his administrator. The latter proposition will, of course, be readily conceded. Appellant also asserts the fact that the probate court had ordered the administratrices to rent the real estate to pay debts did not enlarge their authority because the order conferred at most only a mere power, and did not warrant their defense of the land title but only the bringing of ejectment, if necessary: citing Chamber's Admr. v. Wrights' Heirs, 40 Mo. 482, 485, 93 Am. Dec. 311, and other cases. That, also, may be tentatively conceded, though see St. Louis Nat'l Bank v. Field, 156 Mo. 306, 310-11, 56 S. W. 1095, 1096.

But one of the expressed objectives of the three several quiet title suits was to cancel various of the outstanding notes aggregating $400,000, which would constitute a basis for claims against the estate. Indeed, if we invoke technical rules a mortgage is simply a lien or security and does not pass title to realty, Wakefield v. Dinger, 234 Mo. App. 407, 414(5), 135 S. W. (2d) 17, 22(5); and a suit to cancel a mortgage does not make a title controversy (unless on the ground of fraud and if affirmative title relief is prayed), Nettleton Bank v. McGauhey's Estate, 318 Mo. 948, 953-4, 2 S. W. (2d) 771, 775(8). But conceding arguendo that a suit to cancel a note and mortgage on land does involve title, yet we have no doubt that if an heir in such a suit were represented by one attorney seeking to clear the title, and the administrator were represented by another attorney seeking to cancel the secured note, both would be within their rights. And if that be true, then under our holding on the last preceding assignment the same attorney could represent both.

Respondents have cited several cases holding that where real and personal interests are intermingled and involved in the same suit, the administrator may bring, defend or join in the action. They are:

Butler v. Lawson, 72 Mo. 227, 247-8; ▮▮▮ Bacon v. De Armond, supra, 226 Mo. App. l. c. 626-7, 47 S. W. (2d) l. c. 215(9); Parker v. Simpson, 180 Mass. 334, 341(2), 62 N. E. 401, 403(2). These decisions support the view advanced in the last paragraph. However we should add the appellant has not raised any question of misjoinder of parties or causes of action. Its contention is that the quiet title suits were real actions maintainable only in the interest of the heirs and hence serving them only. For the reasons stated we cannot accept that view.

▮ A few other minor assignments remain. It is contended the administratrices could not legally employ counsel at the expense of the estate to combat the claim of "the woman" as Thomasson's widow and also as his heir in default of other heirs having a superior claim under the statute of descendants and distributions, Sec. 306, R. S. 1939, Mo. R. S. A., sec. 306. Inasmuch as the probate court accepted respondents' services in behalf of the estate by approving the compromise agreement and acting on it in the administratrices' final settlement to revocation, the appellant bank should be estopped to make that contention, so far as the services were necessary and beneficial. Furthermore, if the woman's machinations had been successful at least half the estate would have gone to her as against the beneficiaries in Thomasson's will, which appellant is now upholding. But conceding appellant's contention is good as regards the woman's status and distributive rights, nevertheless it was entirely proper for the administratrices to combat the notes and claims against the estate whether they were held by her or anyone else.

▮ Another contention is that respondents are not entitled to a fee from the estate because they knew while they were serving it that the will was outstanding. The respondents denied this though admitting they had heard there was a will, but upon inquiry at the appellant bank were unable to obtain information with respect thereto. However, they also believed Thomasson to be insane and incapable of making a will, as appellant's brief admits he was after July, 1930. In view of this admission appellant's further contention is without merit, that respondents could have acquired record title to the real estate by obtaining a deed from Conrad E. Frederick. For Frederick got his deeds on February 2, 1931, which was after the date when appellant admits he was insane. Furthermore Frederick was sued twice to cancel the deeds, once by alleged trustees for Thomasson and the woman in August, 1931, and again by the woman in the Federal court on February 6, 1933.

▮ The fifteenth assignment charges the court erred in admitting testimony of one of the respondents concerning statements made by the Attorney General of Missouri in the brief in another case to which appellant was not a party, that the value of the Thomasson estate was $750,000. When the testimony went in appellant's counsel

said he didn't recall whether such a statement had been made in the brief, and the court admitted the testimony subject to being "cleared up." We do not find that the question was raised again; but we do find that in another case in which appellant *was* a party and represented by his present counsel, the opinion recites the gross value of the estate was estimated to be about $750,000. Rogers v. Boatmen's Nat'l Bank, 346 Mo. 911, 914, 144 S. W. (2d) 79.

The final assignment is that the $42,500 judgment for respondents was excessive. Five experienced and able lawyers at the St. Louis bar testified as experts that the services rendered by respondents were reasonably worth not less than $85,000. But they expressed no opinion as to whether and how the fee should be allocated as between services rendered by respondents under the heirs' contract, and services rendered under the administratrices' contract. The chancellor after holding the case under advisement for about four months fixed the fee at one-half the minimum figure given by the witnesses. We can do no better. In our opinion the services were slavish and valuable, notwithstanding they failed of fruition because of the production and probating of the Thomasson will over eight months after his death. Judgment affirmed. All concur except *Gantt, J.,* absent.